IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

LAWRENCE "LARRY" LEE RAMIREZ                               PLAINTIFF

v.                          Civil  No.:  08-cv-5038

SHERIFF KEITH FERGUSON ET AL.                             DEFENDANTS

<u>MEMORANDUM OPINION</u>

Lawrence "Larry" Lee Ramirez ("Plaintiff"), currently an inmate in the Grimes Unit of the Arkansas Department of Correction ("ADC") in Newport, Arkansas, filed this civil rights action under 42 U.S.C. § 1983.  Pursuant to the provisions of 28 U.S.C. § 636, this case is before the undersigned upon consent of the parties. Doc.  58.

A bench trial was held before the undersigned on October 14, 2010.  The undersigned issues the following Memorandum Opinion based upon the evidence presented at trial.

I.  BACKGROUND AND EVIDENCE PRESENTED

Plaintiff presents three claims in this action.  One, that excessive force was used against him on July 7, 2007, the day he first booked into the Benton County Detention Center ("BCDC"). Two, that Defendants were deliberately indifferent to his mental health needs upon his first incarceration in the BCDC from July 7, 2007, through August 3, 2007.  Three, that Defendants were deliberately indifferent to his mental health needs upon his second incarceration in the BCDC from November 6, 2007, through March 26, 2008.  Plaintiff names the following Defendants in both their

individual and official capacities: Benton County Sheriff Keith Ferguson; Captain Hunter Petray, the Jail Administrator during the time period in question; Deputy Pop; Dr. John Huskins; Deputy Charles Tomlin; Deputy Scott Vanatta; Deputy Ivan Torres; and Deputy Megan Hadley Rutledge[1].

At the bench trial, testimony was presented from Plaintiff; BCDC Nurse Marsha Smith; Captain Petray; Dr. Huskins; Deputy Michael Finnegan; and Deputies Rutledge, Vanatta, Torres, and Tomlin.  Below is a summary of the testimony presented at the trial.

## A.  First Incarceration - Excessive Force Claim

### Plaintiff's Version of Events

Plaintiff testified that the night he was arrested and incarcerated in July of 2007, he had been drinking in a bar, mixing alcohol with various mental health medications he was taking.  The next thing Plaintiff remembered was waking up and knocking on a window.  Plaintiff was "out of sorts" but knew he was in jail. Something was said to him by a deputy, but he did not hear what it was.  Within seconds, without any commands given to him, Deputies Tomlin,[2] Vanatta, and Torres entered the cell and Plaintiff was

---

[1]  Defendant Rutledge was originally named as Megan Hadley.  However, she testified at trial that her name is now Megan Hadley Rutledge.  The district court clerk is directed to amend the docket sheet to reflect the correct name of this defendant.

[2]  It appears that Plaintiff identified the officers involved from the BCDC incident reports.  While Plaintiff testified at trial that a Deputy "Reyes" was involved, it appears from the incident reports that it was actually Deputy Tomlin. Defs.' Exs. 12, 13.

forcefully taken to the ground, placed in restraints, and sprayed with oleoresin capsicum ("OC") spray.  Plaintiff testified that he was sprayed after being physically restrained and that the restraints were fastened in back of his body, with his arms connecting to his feet and his stomach down, where he could not stand. Plaintiff testified that while restrained, he was lifted six inches off the ground by the restraints and then dropped two or three times.  Plaintiff did not know if all three deputies involved in the incident lifted him or if it was just one of the deputies, but he could hear them all laughing and making comments such as, "You're not so tough now."   Plaintiff testified that after the deputies left the cell, he remained in restraints, laying on his side on the floor, until a deputy came and escorted him to the shower.  Plaintiff testified that, as there was not a clock in the cell, he did not know how long he was left in the restraints. Plaintiff acknowledged that there were gaps in his memory of the events at issue, but that he specifically remembered being taken to the ground and lifted and dropped by his restraints.

Plaintiff testified that the incident occurred before he had gone through the booking process, during which a Medical Observations Form was completed and a booking photograph was taken. The Medical Observations Form states that Plaintiff was in obvious pain, or had other symptoms suggesting a need for emergency medical services, as he had "scrapes all over his body and face[;] multiple

bruising and knots." Defs.' Ex. 3. The Court notes, as stated in an order entered on October 19, 2010, Doc. 59, that the booking photograph Defendants originally submitted was of such a poor quality that you could merely make out the shape of Plaintiff's head. Defs.' Ex. 1. The Court interrupted the trial and asked defense counsel for a better copy of the photograph. Counsel then provided the Court with another copy of the booking report, Defs.' Ex. 14, a black and white form on which Plaintiff's face could be seen, but the image was not clear enough to discern whether Plaintiff had any visible injuries to his face. The Court then had to inquire whether the Defendants had a color photograph of the Plaintiff on the date in question. The Defendants confirmed that the BCDC did, in fact, have a color photograph and it was provided to the Court later in the proceedings. This photograph reveals that Plaintiff had multiple abrasions, bruises, and blood on his face and swollen eyes. Defs.' Ex. 19.

Plaintiff testified that his eyes were swollen, he had scrapes and bruises, he could barely open his jaw, and he believed he suffered a broken jaw and rotator-cuff tear as a result of the force used against him. Plaintiff was not seen by medical staff until July 11, 2007, four days later.

### Defendants' Version of Events

According to Deputy Vanatta's testimony and written report, Defs.' Ex. 12, the Rogers Police Department notified the BCDC on

July 7, 2007, that they were bringing in a combative suspect.  When Plaintiff arrived at approximately 2:00 a.m., Vanatta went to assist.  As to Plaintiff's demeanor when he arrived at the BCDC, Vanatta testified that Plaintiff was not "aggressive as in trying to fight us.  He was verbally aggressive and ... was just not complying with us.  He wouldn't walk.  He wouldn't do anything we told him and then his language."  Trial Tr. at pgs. 175-76. Vanatta, along with Deputies Tomlin and Torres, had to carry Plaintiff into a holding cell.  At approximately 2:45 a.m., Plaintiff began to punch the cell door with his fist, and was asked to stop, but refused.  Deputy Vanatta testified that he was concerned that Plaintiff "could have broken [his] hand.  Now [he] break[s] his hand, [he] go[es] to the hospital, we have to pay the bill."  Id. at pg. 193.  Deputy Vanatta testified that he, therefore, opened the cell door and ordered Plaintiff to the back of the cell.  When Plaintiff failed to comply, Vanatta sprayed him with a one-second burst of OC spray.  Approximately five minutes later, Vanatta took Plaintiff to the showers, decontaminated him, and returned him to his cell.

Deputy Vanatta testified that at around 4:00 a.m., Plaintiff began punching the cell door again and refused orders to stop.  At that point, Deputies Vanatta, Tomlin, and Torres gathered handcuffs and leg restraints and entered the cell.  Plaintiff sat down, cursed at the deputies, and refused orders to go to the back of the

cell or to place his hands on the wall.  The deputies, therefore, "laid" Plaintiff on the ground and placed him in a five-point restraint, with handcuffs and shackles placed to the front of Plaintiff.  The deputies then exited the cell and Vanatta returned at approximately 6:00 a.m. and removed the restraints.

Deputies Vanatta and Torres denied lifting Plaintiff by his restraints and then dropping him as alleged.  Deputy Tomlin testified that he did not remember the incident, but, reviewing the reports of Vanatta and Torres, it appeared he was merely helping to hold Plaintiff while the other deputies placed Plaintiff in restraints.  No deputy could recall seeing Plaintiff's face in the condition noted in the booking photograph, Defs.'  Ex.  19.  Vanatta testified that the only thing that made contact with Plaintiff's face was the OC spray and that it was not possible for Plaintiff to have sustained the injuries to his face during the restraining incident.

The BCDC use of force policy, which the Court had to interrupt the trial and ask defense counsel to provide, states that jail personnel shall only use that force and restraint necessary to control an inmate who displays violent or threatening behavior. The policy provides that if verbal persuasion and warnings of use of force or disciplinary sanctions are not effective, the deputy shall "call for backup personnel in an attempt to intimidate through a show of force."  If a show of force "is insufficient or

-6-

impossible, the officer shall attempt to use physical holds designed to gain control of the inmate[, but] [n]o blows shall be struck by the officer unless the resisting inmate becomes an attacker." Defs.' Ex. 21 at pg. 1. With regard to the use of OC spray, the policy provides that the decision to use it follows the same basic criteria as the use of a taser and, "[a]s such, it is prohibited from being used ... [o]n any inmate who does not demonstrate (by action, word, or deed) his or her intention to use violence or force against the deputy ...." Id. at pg. 5.

With regard to the OC spray incident, Deputy Vanatta testified, as stated above, that Plaintiff was hitting his cell door and refused an order to go to the back of his cell, but, up to that point, he had not been physically aggressive toward the deputies. Deputy Vanatta acknowledged that he was trained to use control holds before resorting to the use of chemical agents. The Court asked Deputy Vanatta why he did not attempt such holds and also questioned him about BCDC's policy prohibiting the use of OC spray unless an inmate demonstrates an intent to use violence or force. Deputy Vanatta explained that he felt that if he entered Plaintiff's cell and went "hands on" – tried to use holds to gain control of the Plaintiff – there was "going to be a physical altercation" and he believed using the OC spray was a safer alternative. Trial Tr. at pg. 181. When asked why he did not call for backup before entering Plaintiff's cell, as the BCDC policy

-7-

requires before using force and as Vanatta did the second time he entered Plaintiff's cell, Vanatta testified, "I – obviously I didn't have backup.  There was no – if we are all busy, I was called up there because we were obviously busy." Id. at pg. 187. When asked why the second time he entered Plaintiff's cell he had the assistance of Deputies Tomlin and Torres in restraining the Plaintiff, Vanatta explained that "help was available at that point." Id. at pg. 195.

### B.  Denial of Mental Health Care - First Incarceration

**Plaintiff's Version of Events**

Plaintiff testified that he was taken to booking after the alleged excessive-force incident recounted above.  At booking, Plaintiff filled out the Medical Observations Form, Defs.' Ex. 3. According to the form, Plaintiff stated he was not "carrying any medications" and answered "no" to a query regarding "treatment/medications" prior to intake.  Plaintiff did not believe he would have answered no to this question, as he was, in fact, on medication at that time; however, Plaintiff acknowledged that it was possible that this was his answer.

Plaintiff placed his first medical request on July 7, 2007, the date he was booked into the BCDC.  Plaintiff described the nature of his request as "mental health" and explained, "need my meds." Defs.' Ex. 7 at pg. 1.  When Plaintiff saw Dr. Huskins on July 11, 2007, he was taken to a very small room where the doctor,

a nurse, and an officer were inside.  Plaintiff felt pressured to say what he needed, and he was rushed through the process. Plaintiff attempted to tell Dr. Huskins he was on medications and had been seen by Dayspring Behavioral Health ("Dayspring") and also tried to explain the problems he was having, but Dr. Huskins cut him off and stated he would contact Dayspring.

On July 12, 2007, Plaintiff submitted another form, circling to indicate that it was a "grievance," "request" and "medical," and stating "I know this place has no way to deal with mental health issues but I have them, being bipolar, paranoia and major depression."  The BCDC nurse[3] responded, "Saw Dr. on 7/11." Id. at pg. 2.

On July 15, 2007, Plaintiff submitted another medical request, stating:

> Can Dayspring ... be contacted?  I am suppose[d] to take Abilify, Desepramine, and starting Zyprexa.  There is one other that was to replace Desepramine, I can't remember the name.  I've seen medical once already.  Can this request go straight to medical ASAP[?] Been without meds since here. Really need them, having troubles.

The nurse responded, "They were faxed.  We haven't heard a reply." Id. at pg. 3.

---

[3]The name of the nurse who responded to Plaintiff's medical requests during his first period of incarceration is illegible. The nurse who testified at trial, Nurse Marsha Smith, testified that she did not respond to Plaintiff's requests during his first period of incarceration.

On July 24, 2007, Plaintiff submitted another medical request, stating:

> Been here 2½ weeks.  Still don't have medication.  Can Dayspring be contacted again?  It is very important that I get my mental health medication.  If they are not going to be provided, I need to know so I can take further legal action. Already seen doctor and placed additional requests pr[i]or.

The nurse responded on July 25th, "Will show records to jail doctor when we get them."  <u>Id.</u> at pg. 6.

Plaintiff also requested addresses for Dayspring and Ozark Behavioral Health, in an attempt to be proactive about securing his medications, as he had no "free world" family to assist him.   The response to this request was, "Contact your attorney."  <u>Id.</u> at pg. 8.

On August 2, 2007, Plaintiff submitted a grievance, requesting to be moved because he was being harassed by other inmates and stating, "I [have] had 2 breakdowns because I have mental problems. I have a hard time being around people.  I have made several requests for my mental health medication.  I have been here 26 days and still have no meds."  The response section of the grievance states that Plaintiff was released from custody on August 3, 2007. <u>Id.</u> at pg. 7.

With regard to the breakdowns Plaintiff complained of having, Plaintiff testified that he "hears things" and has "paranoia issues."  Plaintiff testified that without his medication during his first period of incarceration, "stuff was getting pretty bad"

and he "couldn't handle it."  Plaintiff explained that he had trouble being around other inmates; he was distraught, anxious and depressed; he had crying spells; he had suicidal thoughts; and he tried to kill himself at one point by tying a sheet around his neck, but it merely caused him to pass out.

### Dayspring Records and Vista Health Records

A medical records cover sheet from Dayspring indicates that Plaintiff's records were sent to BCDC Nurse Andrea Garrett on July 16, 2007.  Dr. Huskins acknowledged that he saw the records at some point, as the cover sheet contains a handwritten notation by Dr. Huskins stating that Plaintiff was last evaluated on April 20, 2007.  However, Dr. Huskins did not know when he saw the records and there is nothing else to indicate when the records were received at the BCDC.  When asked whether he normally makes a note of when records are received, Dr. Huskins acknowledged, "I usually put a date on it, but I did not that time." Trial Tr. at pg. 77.  It appears from the response to Plaintiff's July 24th medical request – "will show records to jail doctor when we get them" – that the records still had not been received by July 25, 2007.

The Dayspring records indicate that Plaintiff underwent a psychiatric evaluation in April 2007 for "chronic feelings of hopelessness, worthlessness, or inappropriate guilt w/frequent suicidal thoughts & actions."  Defs.' Ex. 8 at pg. 18.  Plaintiff was diagnosed with Bipolar II Disorder, chronic, severe, and with

Panic Disorder without agoraphobia.  Id. at pg. 17.  The records
contain a copy of a prescription, dated June 13, 2007, for Lamictal
(with five refills authorized) and Zyprexa (with one refill
authorized).  Id. at pg. 20.  According to Plaintiff, he did not
fill these prescriptions prior to his incarceration, as he was
using samples given to him by Dayspring.

Medical records from Vista Health were submitted by Plaintiff
as an exhibit to document his mental health problems, but there is
no indication that Defendants had access to these records during
Plaintiff's first period of incarceration.  According to these
records, Plaintiff was admitted to Vista Health for approximately
one week in January 2007, after attempting to commit suicide by
slashing his wrists.  Plaintiff was noted to have a known bipolar
history and he presented with extreme suicidal ideation, stating
that "eventually he will kill himself" and that he had "taken a
knife to his throat 3 times earlier but was too scared to go
through with it."  It was noted that he had been "off his meds,"
and that, during his treatment at Vista Health, he was found crying
under his bed on two occasions.  Plaintiff received psychiatric
treatment at Vista Health and was discharged with prescriptions for
Desipramine, Abilify, and Rozerem, and with a plan to pursue
outpatient treatment at Ozark Guidance Center.  Pl.'s Ex. 2.

**Defendants' Version of Events**

Dr. Huskins saw the Plaintiff on July 11, 2007. Dr. Huskins'

typed notes reflect:

> Larry Ramirez comes in. He's been on medications for his
> nerves. He chews tobacco. He has had a history of knee
> injury, kidney injury, head injury. We will try to
> arrange for medical records or pharmacy notes.

Defs.' Ex. 5 at pg. 4. Dr. Huskins testified that when he asked

Plaintiff what he needed that day, Plaintiff stated that he needed

his psychiatric medications and indicated that he was taking

Abilify and Despiramine. Dr. Huskins testified that

Plaintiff's mood and affect seemed normal and Dr. Huskins did not

perceive any imminent care need regarding Plaintiff's mental

health. However, Dr. Huskins acknowledged that he usually only

sees an inmate for two to three minutes and that the medications

Plaintiff indicated he had been taking would have signaled to Dr.

Huskins that Plaintiff had a major mental health problem. Despite

this fact, Dr. Huskins never asked Plaintiff what problems he was

having or about his "psychiatric stuff." Trial Tr. at pg. 73.

Instead, Dr. Huskins only asked Plaintiff general medical history

questions, such as known allergies, past surgeries, etc. When

asked whether, in his private practice, he would have asked a

patient in this same scenario about what mental health problems the

patient was having, Dr. Huskins acknowledged, "I probably would ask

it more in private practice." Id. at pg. 72. Plaintiff asked Dr.

Huskins:

-13-

Q    Okay.  So without actually talking to me, you
     wouldn't know that I hear voices?

A    No.

Q    You wouldn't know that I see things?

A    No.

Q    You wouldn't know that I have a lot of other
     thoughts that go on in my head and that are racing
     and that ... I suffer from a lot of different
     stuff.  You wouldn't be able to tell that just by
     looking at me?

A    No.

Q    And you think – and you can ascertain that in five
     minutes?

A    I get an idea about how you're doing at that time
     and then we would request your medical records.  We
     don't stop at that.   That's just the initial
     evaluation and then we continue on from there.

Id. at pg. 117.

When asked whether, when he saw the Plaintiff on July 11th, he

noticed any physical injuries, Dr. Huskins testified that he did

not make any notations in his records about any injuries.  When

shown the booking photograph of the Plaintiff taken just four days

prior, Dr. Huskins acknowledged that Plaintiff had abrasions across

his forehead and cheeks and swelling of his right eye and that

those injuries would have looked "exactly the same" when he saw

Plaintiff on July 11th.  Id. at pg. 111.  Dr. Huskins did not ask

Plaintiff how he sustained the injuries and, when asked why he made

no notations in his records of Plaintiff's injuries, Dr. Huskins

-14-

acknowledged that he had no explanation for failing to do so and that he "should have put a note about that in there."  Id.

Dr. Huskins testified that he faxed Dayspring for Plaintiff's records on July 11th and, the next day, he also called the pharmacy Plaintiff indicated he had been using.  The pharmacy advised Dr. Huskins that Plaintiff's last medication refill was on April 20, 2007, for a 30-day supply of Lamictal and Abilify.  According to Dr. Huskins, Abilify is a major tranquilizer taken for anxiety and neurotic problems and Lamictal is a seizure medication used primarily for bipolar disorders.  As it appeared to Dr. Huskins that Plaintiff had been off of his medication for a couple of months and as Plaintiff indicated that he had been taking Despiramine rather than Lamictal, Dr. Huskins wanted to see the records from Dayspring before deciding what to do.  Dr. Huskins expected to have the records within a day or two, but, as stated above, there is no indication as to when the records were received at the BCDC and Plaintiff never received any medication for his mental disorders during his first period of incarceration.

Dr. Huskins testified that he did not have a "tickler" system or reminder system in place to follow up on the receipt of Plaintiff's Dayspring records and that he did not see the medical requests Plaintiff submitted on July 12th, 15th, and 24th, so he did not know that Plaintiff was having any problems.  Dr. Huskins testified that had he seen Plaintiff's medical requests or seen

Plaintiff's Dayspring records, he would have offered Plaintiff the medications he had been prescribed by Dayspring, but he would have recommended Mellaril instead.  According to Dr. Huskins, Mellaril is an anti-psychotic, similar to the Zyprexa Plaintiff had been prescribed by Dayspring.  When the Court asked if Mellaril would cover the symptoms treated by Lamictal as well, Dr. Huskins testified, "It usually does.  You could always add Lamictal or Lithium or whatever you wanted to."  Trial Tr. at 109-10.

     With regard to the medical requests, the Court specifically asked Dr. Huskins, "So the jail's policy is ... that you don't get these medical requests?"  Dr. Huskins responded, "I do not."  Id. at pg. 101.  The Court then questioned Dr. Huskins about the BCDC's written medical call policy, which provides, "Copies of all sick call forms will be retained by the medical staff and will be filed in each inmate's confidential medical record."  Defs.' Ex. 6 at pg. 5.  Dr. Huskins then acknowledged that the medical request forms are in an inmate's medical file, along with Dr. Huskins' notes. When asked whether, if he had looked at Plaintiff's medical file, he would have seen that there were medical request forms in there, Dr. Huskins responded, "Medical forms are all on the left and my notes are all on the right...  I don't' look at them, no."  Trial Tr. at pg. 123.

     Dr. Huskins testified as to the effects Plaintiff likely would have felt after going almost a month without his medications.

-16-

According to Dr. Huskins, Plaintiff's bipolar disorder would have caused exaggerated mood swings, with Plaintiff either "real hyper or real down." Due to his schizophrenia,[4] Plaintiff likely would have perceived things that were not truly there or not as perceived. Additionally, Plaintiff would have been very uncomfortable as he continued without medication.

### C.   Denial of Mental Health Care - Second Incarceration

**Plaintiff's Version of Events**

Plaintiff testified that when he was transferred to the BCDC from the Larimer County, Colorado Detention Center ("LCDC"), on November 6, 2007, he was transported with a transfer record. The transfer record stated that Plaintiff had the following psychiatric problems: Bipolar/Psychotic Features/Schizophrenia. The transfer record further stated that Plaintiff was a "high suicide risk" and that his current medications included: Zyprexa 30 mg., Zoloft 50 mg., and Lamictal 100 mg. Pl.'s Ex. 1 at pg. 6.

According to Plaintiff, the transfer officer had the transfer record in an envelope and handed it to the Plaintiff when they arrived at the BCDC. Plaintiff then gave the envelope to either Deputy Reyes or Deputy Michael Finnegan, the deputies who fingerprinted him and patted him down when he booked into the BCDC.

---

[4]While the Dayspring records do not reflect a diagnosis of schizophrenia, other records, which will be detailed below, indicate that Plaintiff has been diagnosed as suffering from this disease. Pl.'s Ex. 1.

-17-

According to the Plaintiff, Deputies Reyes and Finnegan were not sure what to do with the envelope, so they asked Deputy Rutledge, who was working at the computer.  Plaintiff testified that he explained to the deputies that the envelope contained a list of the medications he had been taking at the LCDC, but Deputy Rutledge instructed the other deputies, "Put it in his property, inmates at the Benton County Jail don't have mental health problems, they're just a bunch of manipulators."

Plaintiff testified that during the booking process, Deputy Rutledge typed in the answers he gave to the Medical Questionnaire form and Suicide Risk form.  Defs.' Ex. 4.  On the Medical Questionnaire form, Plaintiff answered, "Yes" to the question asking if he was currently taking medications, and the following medications were listed: "Solaf, Zyprexa, Antimitcal.[5]"  <u>Id.</u>  On the suicide risk form, it is documented that Plaintiff reported having attempted suicide in June 2007, and having received inpatient treatment at Vista Health.  <u>Id.</u>  Plaintiff testified that he actually told Deputy Rutledge that he had been in and out of treatment at several different places, but she stated that she needed specific dates, so he told her his most recent inpatient treatment and she "didn't type the rest."

---

[5] The correct spelling of these medications is Zoloft and Lamictal.

-18-

Plaintiff testified that he assumed the Medical Questionnaire and Suicide Risk form would be forwarded to the medical staff and that his medication needs would be dealt with, so he did not place a medical request form right away.  The first medical request contained in Defendants' exhibits is dated December 19, 2007.  Plaintiff testified that he submitted lots of requests for his medications prior to this date, and also requested that the transfer record be taken out of his property as "proof" of his need for the medications, but to no avail.

In the December 19th medical request, Plaintiff stated, "I have asked my lawyer to request the judge to court order my mental health medication.  Can you please let me know when you have been informed?"  Defs.' Ex. 7 at pg. 8.  Nurse Marsha Smith responded, "Have not heard anything."  Id.  Plaintiff explained that he had contacted his lawyer about the matter because his previous requests for his medications had been ignored.

On December 26, 2007, Plaintiff submitted another medical request "to see the psy. doctor."  Plaintiff stated, "I request from the doctor to be seen by mental health.  I asked my lawyer to get my meds court ordered.  Can I be seen?"  Id. at pg. 9.  Plaintiff testified that he saw Dr. Huskins on December 27th and tried to explain the medications he had been taking at the LCDC and the transfer record documenting this in his property; however, with the "whole rush, rush, thing," he was just ignored and Dr. Huskins

-19-

merely prescribed him 10 mg. of Mellaril, which "did absolutely nothing" for the Plaintiff.

On January 5, 2008, Plaintiff submitted the following medical request: "Can my meds please be up[p]ed. I've been on Thorizine in the past but I was taking a lot higher dosage. 250 mg." Id. at 11. On January 6th, Plaintiff saw Dr. Huskins, who noted "affect good continue med." Defs.' Ex. 5 at pg. 2.   Dr. Huskins' notes reflect that Plaintiff refused his medication on January 11th and refused doctor call on February 3. Id. Plaintiff acknowledged that he refused his medication, explaining that he did not want to take it anymore because it was not working.   However, Plaintiff denied ever refusing to see the doctor.

On February 12, 2008, Plaintiff submitted the following request:

> Can I please be placed in segregation? Even if it's the hole.... [H]ave spoke[n] with medical about my mental health and they gave me a medication that wasn't for my problems. I have asked and have let the jail know that I have problems. Now I feel that I am getting worse. There are to[o] many people and I feel very unsafe. My voices are getting really bad and I am having more anxiety attacks. I'm trying the best I can to manage but it is getting really hard.... I'm just having many problems, one is paranoia.... I just need to be alone away from people. Please help. Also, can I please be see[n] by someone with Ozark Guidance.

Defs.' Ex. 7 at pg. 12. Dr. Huskins saw Plaintiff on February 13th and started him back on the Mellaril 10 mg.

On February 22, 2008, Plaintiff submitted a medical request asking to have his "mental health medication increased." Id. at

-20-

pg. 13.   Plaintiff saw Dr. Huskins on February 25th, and his medication was increased from twice a day to three times a day, but Plaintiff testified that he still had problems with paranoia and hearing voices.   On March 7th and 12th, Plaintiff submitted additional medical requests, asking to have his medication increased or changed because it was not working.  Defs.' Exs. 15, 16.   Plaintiff saw Dr. Huskins on March 17th, and his Mellaril dosage was increased to 25 mg.  Plaintiff was transferred from the BCDC to the ADC on March 26th.

Plaintiff testified that he never received any counseling and that Dr. Huskins never asked him if he was "doing okay" on his medications.  According to Plaintiff, when he saw Dr. Huskins, Dr. Huskins "rushed him through" and would not listen to him.

### Defendant's Version of Events

Neither Deputy Finnegan nor Deputy Rutledge could recall Plaintiff's booking into the BCDC on November 6, 2007.  Deputy Rutledge testified that she could not recall whether or not she booked Plaintiff into the BCDC or whether or not she completed his Medical Questionnaire and Suicide Risk forms.  While Deputy Rutledge's name is typed in on the booking report as the booking officer, Defs.' Ex. 2 at pg. 1, Deputy Rutledge testified that the booking report was not signed by her, so she could not "say for sure" that she was the booking officer.  The Court notes that the signature of the deputy who signed the booking report is illegible.

-21-

According to Deputy Rutledge, "You have to put in a [deputy's] name to put you into the system.  If there [are] multiple deputies working in booking, just because that person's name is in the computer, that's not who necessarily books you."  Trial Tr. at pg. 139.

Deputy Rutledge did not recall telling Deputies Reyes or Finnegan to put Plaintiff's transfer record from the LCDC in Plaintiff's property.  Deputy Rutledge testified that inmates often transfer in from other facilities with medical records and those records are placed in a box to be distributed to the nurse.

Nurse Smith testified that, in her opinion, Plaintiff's Medical Questionnaire and Suicide Risk forms should have been forwarded to medical so they could have evaluated Plaintiff. Plaintiff indicated he was taking Zoloft, which Nurse Smith identified as an anti-depressant, and Zyprexa, which Nurse Smith identified as an anti-psychotic, and Lamictal, which treats bi-polar disorders, according to Nurse Smith.  However, Dr. Huskins only prescribed Plaintiff one medication, Mellaril, which Nurse Smith testified was an anti-psychotic drug.

Dr. Huskins testified that, according to his notes, Defs.' Ex. 5 at pg. 2, he saw the Plaintiff on December 27, 2007, for "mental problems" and Plaintiff advised him that he had been getting his medications at Dayspring, so Dr. Huskins requested those records again and received the same set of records that were received

-22-

during Plaintiff's first period of incarceration. Dr. Huskins explained that he requested the records again because the BCDC does not keep a continuing medical record for inmates from one incarceration to the next. When asked whether the Plaintiff told him about the LCDC transfer record documenting his medications, Dr. Huskins testified that Plaintiff just told him about the Dayspring records, noting "That's what I wrote down anyway." Trial Tr. at pg. 115.

Dr. Huskins testified that he started the Plaintiff on Mellaril when he saw him on December 27th. When asked why he started the Plaintiff on medication before receiving the Dayspring records when he did not do so during Plaintiff's first period of incarceration, Dr. Huskins explained, "If I thought he had some altered affect where he was exhibiting some signs of stress or whatever, then I sometimes would go ahead and start on medication waiting for records to come." Id. at pg. 79.

Dr. Huskins testified that when he saw Plaintiff on January 6, 2008, "his complaint was he wanted to know about his medicine. And I thought his affect good, so I was going to continue his medication is what my note says." Id. at pg. 83. As discussed above, Dr. Huskins does not look at inmates' medical requests, so he did not look at Plaintiff's January 5th request asking if his medication could be increased because he had been on a lot higher dosage in the past. The Court asked Dr. Huskins:

-23-

Q     If you had seen this medical request, do you think
      you would have [increased his medication] ...?

A     No.  If I talked to him ..., he can tell me at that
      time if he wants more ... and if I talked to him
      and he feels like ... he's doing okay and doesn't
      request for any more, then I'll continue him on
      that ... dose.

Q     Well, why did you think you were seeing him on the
      6th?

A     He wanted ... to talk about his medication....

Q     What did he say about it?  Why would he need to see
      you if he was doing fine on it is what I'm getting
      at?

A     He wouldn't need to see me, but if he wanted to
      come in and talk about ... his medication then ...
      I would ask him [how] he was doing....

Q     He was already on the Mellaril, is that right?

A     Yes.

Q     So why did you think he would want to see you again
      ... if he was already on the Mellaril and it was
      working?

A     Because usually they want to see it because it's a
      different pill than they're used to seeing.  They
      want to know what this is ....

Q     Well, in his case, why did he want to see you? ...

A     He wanted to talk about his medication.

Q     What did he want to say about it?

A     He just – he wanted to ask about the medication.  I
      didn't put exactly what he asked about it.

Q     So you don't know?

A     I don't know, no.

-24-

> Q    So it could very well be that he said it wasn't
>       working?
>
> A    It could be, but I put down his affect was good
>       which would suggest that to me he was saying he was
>       doing okay on the medication.

Id. at 124-26.

Dr. Huskins testified that his notes reflect that Plaintiff began refusing his medication on January 11th and refused doctor call on February 3rd. Dr. Huskins testified that he saw Plaintiff again on February 13th, restarted his medication, "And I told him at that time that he needed to keep talking to us, to not stay away when things didn't seem right. So I thought that we had kind of established a rapport at [that] time and I remember him from that point on." Id. at pg. 85. Again, Dr. Huskins had not looked at Plaintiff's medical request that precipitated this doctor visit. The Court asked Dr. Huskins about this visit and Plaintiff's subsequent medical requests and doctor visits:

> Q    Did you ask [Plaintiff] why he quit taking [the
>       medication]?
>
> A    I didn't ask him....
>
> Q    Do you think it would have been helpful to see the
>       form he had filled out explaining why he needed to
>       see you, this form ... where he said he's hearing
>       voices; they're getting really bad; that they gave
>       him [medication that wasn't for his problems]; that
>       explained in his mind why he didn't want to take
>       it.  Do you think it would have been helpful to see
>       this?
>
> A    It might have been.  But still by talking to him, I
>       thought that was better than reading the form ....

Q     Did you know he was hearing voices?

A     No.

Q     Did you know he was having more anxiety attacks?

A     No.

Q     So it might have been helpful to read the form where he [explained everything]?

A     Yes.

Q     ... 2/22, "Can I please have my mental health medication increased?" You saw him 2/24 and tell me what your notes say?

A     That he was improved on medication, that we're continuing current medication ... and we increased his medication.

Q     ... So he fills out a form on February 22nd saying he feels he needs his medication increased. When you see him on February 24th, you think he's improved? ...

A     Well, I talked ... to him to see ... what he described to me that day ... [and] he said he was improved on the medication.

Q     He said that?

A     Yes.

Q     Do you specifically recall that, Dr. Huskins?

A     That's what I wrote down that he said, improved on medication.

Q     ... Then we have a request on March 7th. "Can I see doc to have my meds ... raised and changed?" ...

A     The next time I saw him was on the 17th of March.... He said he was having an increase in stress and so I increased his medication again....

Q     It looks like he submitted a request ... [on March 12th] ... and this was prior to you seeing him on

-26-

the 17th, "I've placed a request ... and still
haven't seen doc.  Want meds ... changed.  Need to
talk to doctor.  Meds not, underlined working."
And then your note on March 17th says, "He's doing
better on Mellaril, just not doing as good as he
should."  Is that what he told you?

A    Yes.

Id. at pgs. 128-31.

### BCDC's Policies and Procedures

The BCDC's Health Services policy provides, "Jail medical

services include ... medical and psychiatric availability ... and

referral service for hospitalization and specialty clinics as

needed."  Defs.' Ex. 6 at pg. G-10.1 ¶ II.D.2-3.  The medication

policy provides, "The medical staff will review ... the complete

health screening forms of inmates admitted who might have a

prescription at admission."  Id. at pg. G-14.1 ¶ II.B.

Captain Hunter Petray, testified that he was the jail

administrator during the time period in question and that his job

included "oversee[ing] that the policies and procedures were

adhered to."  Trial Tr. at pg. 34.  With regard to the training the

deputies receive on the BCDC's policies and procedures, Captain

Petray testified, "[W]e tell them, we go over the policy of what

you need to do.  This is what the policy states.  So I mean that's

the best we can do."  Id.

Captain Petray testified that the policy requiring medical

staff to review health screening forms of inmates who might have a

-27-

prescription at admission refers to inmates who have prescription medication physically present with them when they book into the facility.  Inmates, such as Plaintiff, who indicate during booking that they are on medication but do not have the medication with them have to fill out a medical request form to see the doctor.

Plaintiff asked Captain Petray about what happened when an inmate "answers that questionnaire and he answers yes to past suicidal risks, yes, I'm on mental health medication ...?"  Captain Petray responded, "I don't know that there's a specific form that says, this guy listed mental problems when he was booked in.  You know, previous mental problems."  Id. at pgs. 39-40.  In fact, the Suicide Risk form referenced above asks, "Have you *ever* been in a mental institution or had pscyhiatric care?  If so, explain"; and also asks, "Have you *ever* attempted suicide?  If so, when and where?"  Defs.' Ex. 4 at pg. 2 (emphasis added).

With regard to the Medical Questionnaire forms, Captain Petray testified that these forms are not forwarded to the medical staff unless the inmate answers "Yes" to several of the questions, or the inmate has obvious medical problems or an emergency medical need.  Captain Petray testified that he believed the BCDC had a written policy saying this.  As noted in the Court's October 19, 2010 order referenced above, defense counsel did not submit the BCDC's written policy on booking and intake procedures as an exhibit.  The Court

-28-

had to interrupt the trial again and ask for this policy. It
provides:

> The intake deputy will be particularly aware of mental
> health questions.  When one or more of these questions
> are answered "Yes," the intake deputy will notify the
> medical staff as soon as possible.  The shift supervisor
> will be notified and a notation will be made in the
> inmate's booking file.

Defs.' Ex. 20 at pg. 10.4 ¶ III.M.6.a.

Deputy Rutledge testified that she never sends the Medical
Questionnaire forms to the nurse; if an inmate has an emergency
medical need or a serious health issue, such as diabetes, HIV, or
tuberculosis, then she would notify her sergeant, who would then
decide whether to notify the nurse.  With regard to the Suicide
Risk form, Deputy Rutledge testified that even if an inmate
indicated that he had attempted suicide in recent months, as the
Plaintiff did, she would not take any action and would only notify
her sergeant if the inmate indicated that he was currently
contemplating suicide.  When asked what training she received to
know when to forward the Suicide Risk form to the medical staff,
Deputy Rutledge testified that she was "just shown how to do the
procedures, ask the questions," and that she "wasn't trained to
forward it to medical."  Id. at pg. 153.  As stated above,
Plaintiff answered "Yes" to one or more questions regarding his
mental health: he indicated that he was taking three medications
for his mental disorders; that he had attempted suicide five months
prior; and that he had been admitted to a mental health facility

-29-

following his suicide attempt. The Court read the above quoted portion of the booking/intake policy to Deputy Rutledge and asked her:

> Q    So pursuant to this written policy, do you think medical staff should have been notified?
>
> A    It should have been notified.  However --
>
> Q    But that's not in practice what you-all do?
>
> A    Right
>
> Q    So you don't follow your policy?
>
> A    Yes ma'am.
>
> Q    Why not?
>
> A    I don't have an answer for that.
>
> Q    And you weren't trained on this policy?
>
> A    No, ma'am

Trial Tr. at pgs. 154-55.

Deputy Finnegan testified that he did not know if there was a policy in place detailing when a Medical Questionnaire form should be forwarded to the medical staff.  Deputy Finnegan testified that it was a "common sense judgment call" to forward it if the inmate had a serious medical need, such as heart problems, a history of stroke, or was on blood pressure medications.  Deputy Finnegan testified that he was unsure of the policy or procedure and received no training on what to do if an inmate indicated he was on medications during book-in, but he did not have those medications with him.

-30-

## II. DISCUSSION

Plaintiff asserts three separate claims: (1) that he was subjected to excessive force on July 7, 2007; (2) that he was denied proper mental health treatment during his first incarceration beginning July 7, 2007, through August 3, 2007; and (3) that he was denied proper mental health treatment during his second period of incarceration beginning November 6, 2007, through March 26, 2008.  The Court will address each claim in turn.

### A. First Incarceration - Excessive Force

#### Liability

Plaintiff was a pretrial detainee when he booked into the BCDC on July 7, 2007, and, thus, his excessive-force claim is properly analyzed under the Due Process Clause of the Fourteenth Amendment. See Graham v. Conner, 490 U.S. 386, 395 & n. 10 (1989).  Courts generally analyze excessive-force claims of pretrial detainees in the same way as those of arrestees.  See Andrews v. Neer, 253 F.3d 1052, 1060 (8th Cir. 2001) ("The evaluation of excessive-force claims brought by pretrial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard").  The use of force must be necessary to some legitimate institutional interest, such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals.  See Johnson-El v. Schoemehl, 878 F.2d 1043, 1048 (8th

-31-

Cir. 1989).  Force may be justified to make an inmate comply with a lawful order, but only if the inmate's noncompliance poses a threat to other persons or to prison security.  See Treats v. Morgan, 308 F.3d 868, 875 (8th Cir. 2002).

To determine whether the Plaintiff was subjected to excessive force during the July 7th incident, the Court must first assess the credibility of the witnesses, as Plaintiff and Defendants' version of events are at odds.  The Court found the Plaintiff to be a very credible witness.  The Plaintiff acknowledged that he had gaps in his memory, which is understandable given that the incident occurred more than three years prior to the trial and that Plaintiff was apparently in a very intoxicated state, as he had been drinking and taking mental health medications at the time of his arrest.

Plaintiff had a very credible demeanor and appeared to make great efforts to search his memory and testify to only those events he could specifically recall.  Events or details that Plaintiff could not remember, he was honest about, even when it could have been detrimental to his claims.  For example, Plaintiff acknowledged that, given his intoxicated state, it was possible that he answered "no" when asked if he was taking any medications.  Plaintiff also acknowledged that he could not remember whether or not he was sprayed with OC spray prior to being placed in restraints.  The Court construes this acknowledgment to mean that

Plaintiff had no memory of when Deputy Vanatta first entered his cell and sprayed him with OC spray, and only remembered the second entry into his cell by all three deputies.  For other reasons detailed below, the Court found Plaintiff's testimony more credible than that of Deputies Vanatta, Tomlin and Torres.

While Plaintiff had no recall of Deputy Vanatta's first entry into his cell, the Court finds that Deputy Vanatta's own testimony – the portions of it that the Court credits – establishes that his use of OC spray was not justified.  Deputy Vanatta initially testified that Plaintiff was "not aggressive as in trying to fight us. He was verbally aggressive and ... was just not complying with us.  He wouldn't walk.  He wouldn't do anything we told him." Trial Tr. at pgs. 175-76.  According to Deputy Vanatta, Plaintiff had to be carried to the holding cell and he later began banging on the door and refused orders to stop and to go to the back of the cell, so Deputy Vanatta sprayed him with OC spray.

Plaintiff testified that he just remembers waking up; knocking on a window; being "out of sorts" but knowing he was in jail; and being unable to hear something that was being said to him by a deputy.  Given Plaintiff' state, it is very possible that he *could not* physically comply with any of the deputies' orders.  Further, Deputy Vanatta acknowledged that Plaintiff was not being physically aggressive.  It was not until the Court questioned Deputy Vanatta about the BCDC's policy prohibiting the use of OC spray unless an

-33-

inmate demonstrated an intent to use violence or force that Deputy Vanatta testified that he believed if he entered Plaintiff's cell and attempted to use holds to gain control of him, there was "going to be a physical altercation."  Trial Tr. at pg. 181.  The Court does not find Deputy Vanatta's testimony in this regard credible.

It is hard to fathom why a deputy would believe an inmate, who had shown no physical aggression other than banging on a door, could not be subdued with control holds, which Deputy Vanatta acknowledged he was trained to use before resorting to the use of OC spray.  The BCDC's own policy provides that deputies are to attempt such holds "unless the resisting inmate becomes an attacker."  Defs.' Ex. 21 at pg. 1.  Further, had Deputy Vanatta feared a physical altercation would ensue if he entered Plaintiff's cell, the Court questions why he did not restrain Plaintiff immediately after the use of the OC spray and why he then returned alone to Plaintiff's cell just five minutes later to escort him to the shower, as stated in his incident report.  While the OC spray certainly would have affected Plaintiff's vision, it would not have prevented Plaintiff from attempting to attack Deputy Vanatta when he returned to the cell.

Further, the Court finds that Deputy Vanatta had another option available to him – calling for backup.  The BCDC policy provides that before force is used against an inmate, a deputy should call for backup "in an attempt to intimidate through a show

of force." Id.   The Court does not credit Deputy Vanatta's testimony that all other deputies were "obviously busy." Trial Tr. at pg. 187.  Deputy Vanatta gave no explanation as to why Deputies Tomlin and Torres were not available to assist when Deputy Vanatta first entered Plaintiff's cell and used the OC spray, but were available to assist approximately 45 minutes prior in carrying Plaintiff to the holding cell and were also available to assist in restraining the Plaintiff approximately one hour later.

Based on the foregoing, the Court does not credit Deputy Vanatta's testimony that he believed Plaintiff posed a physical threat to him, or his testimony that he could not use control holds or call for back-up to subdue the Plaintiff.  The Court finds that Deputy Vanatta chose to use the OC spray simply because Plaintiff did not, or, more likely, could not comply with Deputy Vanatta's orders.  The use of the OC spray was, therefore, not justified and constituted excessive force.  See Thomas v. Byrd, 2009 WL 4546666, **9-10 (E.D. Ark. 2009) (noncompliance, standing alone, is an insufficient justification to pepper spray a nonthreatening, though disobedient, pretrial detainee).

With regard to the second entry into Plaintiff's cell, the Court credits Plaintiff's testimony that Deputies Vanatta, Tomlin and Torres entered his cell and, without giving him any commands, forcefully took him to the ground, restrained his arms and legs behind his back, sprayed him with OC spray again, and lifted him by

his restraints and dropped him two or three times.  Plaintiff's testimony about this occurrence included very specific descriptions that the Court finds would be unlikely for Plaintiff to have fabricated.

Further, Plaintiff's booking photograph, Defs.' Ex. 19, shows bruising, abrasions and blood on Plaintiff's head and face, along with swollen eyes.  The "Medical Observations" form states that Plaintiff was in obvious pain, or had other symptoms suggesting a need for emergency medical services, including having scrapes all over his body and face, with multiple bruises and knots. Defs.' Ex. 3.  None of the Defendants could remember if Plaintiff had these injuries prior to his arrival at the BCDC.  The Court credits Plaintiff's testimony that the booking photograph was taken and the Medical Observations form was completed after Deputies Vanatta, Tomlin and Torres entered his cell and restrained him.  Accordingly, the Court finds that the booking photograph and Medical Observations form document Plaintiff's injuries stemming from the force used against him.

The Court finds that the force used by Deputies Vanatta, Torres, and Tomlin was excessive and was not reasonable to quiet an inmate from banging a door.  Although Deputy Vanatta stated the force was used, in part, because they were concerned Plaintiff would break his hand on the door, the Court notes that no injuries to Plaintiff's hand were reported.

-36-

While Plaintiff did not know if one or all of the deputies lifted and dropped him from his shackles and did not identify which deputy sprayed him with the OC spray the second time, he did hear all three deputies laughing and commenting, "You're not so tough now."  Deputies Vanatta, Tomlin and Torres are all liable in this instance, as it has been held that even if an officer did not participate in the use of unnecessary or excessive force, "he was nonetheless under a duty to prevent the use of such force, even if the officers beating [the detainee] were his superiors" if the constitutional violation took place in his presence. Webb v. Hiykel, 713 F.2d 405, 408 (8th Cir. 1983); Putman v. Gerloff, 639 F.2d 415, 423 (8th Cir. 1981).

Accordingly, the Court finds that Defendants Vanatta, Tomlin and Torres subjected Plaintiff to excessive force and are liable in their individual capacities.  There is no basis for holding any other named Defendant liable, either in their individual or official capacities, for the excessive force incidents, as there was no evidence presented of any other Defendant's personal involvement in the incidents or of any unconstitutional policy or custom or failure to train that contributed to the incidents. See Brockinton v. City of Sherwood, 503 F.3d 667, 675 (8th Cir. 2007).

### Compensatory Damages

With regard to damages, the Court awards Plaintiff $500.00 against Deputy Vanatta for the pain and suffering caused by the

unjustified use of OC spray during the first entry into Plaintiff's cell.  Cf. Thomas, 2009 WL 4546666, *12 (finding $500 to be a reasonable sum to fairly and justly compensate inmate for pain and suffering caused by use of pepper spray).

With regard to the use of force during the second entry into Plaintiff's cell, the evidence indicates that Plaintiff sustained multiple abrasions and bruises and his eyes were swollen. Plaintiff testified that he could barely open his jaw and believed it was broken and also believed he suffered a rotator cuff tear; while there is no medical evidence to corroborate these injuries – perhaps there would have been had Plaintiff received medical care for these injuries – the Court credits Plaintiff's testimony that he suffered some sort of injury to his jaw and shoulder.  The Court finds $5,000.00 to be a reasonable sum to compensate the Plaintiff for his injuries and pain and suffering.  Cf.  Boesing v. Spiess, 540 F.3d 886, 889-90 (8th Cir. 2008) (upholding $5,000.00 compensatory award to arrestee who, while handcuffed, was sprayed with mace and struck on head and back with baton, sustaining a laceration on his head and deep bruises on his back and side); Jackson v. Crews, 873 F.2d 1105, 1109 (8th Cir. 1989) (upholding jury award of over $5,000.00 in compensatory damages to arrestee who had his face slammed into the pavement by arresting officer); Williams v. Omodt, 640 F. Supp. 120, 123 (D. Minn. 1986) (awarding inmate $5,000.00 in actual damages for bruises, contusions,

swelling, and considerable pain he sustained from being choked, forced to the ground, and hit several times by officer). Deputies Vanatta, Tomlin and Torres shall be jointly and severally liable for this amount.

## Punitive Damages

Plaintiff did not specify in his pleadings whether he was seeking punitive damages, but merely stated that he was seeking "mon[e]tary damages" equal to $100,000.00." Doc. 42 at pg. 2. The Eighth Circuit Court of Appeals has held that punitive damages may be awarded regardless of whether they were asked for in a complaint, as "Fed. R. Civ. P. 54(c) provides that 'every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings.'" Bowles v. Osmose Utils. Servs., Inc., 443 F.3d 671, 675 (8th Cir. 2006). As in Bowles, it cannot be said that an award of punitive damages would result in any unfair surprise to the Defendants, as the Court can think of no way in which the Defendants would have defended themselves any differently had punitive damages been specifically pled in the complaint.

Punitive damages may be awarded when a "'defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" Royal v. Kautzky, 375 F.3d 720, 724

(8th Cir. 2004), cert. denied, 544 U.S. 1061 (2005), (quoting Smith v. Wade, 461 U.S. 30, 56 (1983). If a court finds a defendant's conduct meets the threshold for awarding punitive damages, the court should then consider the two purposes of punitive damages: (1) punish willful or malicious conduct; and (2) deter future unlawful conduct. Id.

The Court finds that Deputies Vanatta, Tomlin and Torres acted willfully and maliciously in using excessive force against the Plaintiff. As discussed above, Plaintiff did not physically resist or threaten the officers, yet he was sprayed with OC spray twice, forcefully taken to the ground, restrained with his arms and legs behind his back, and lifted and dropped by his restraints while the deputies laughed and taunted him. The Court respects the fact that jail deputies have a difficult job and must make split-second decisions in situations where their safety or the security of the jail is at risk. However, that is not what occurred here. What occurred here was an abuse of the deputies' power over an inmate.

The Court finds that punitive damages are warranted to punish these deputies and to deter them, as well as other deputies, from such abusive conduct in the future. Accordingly, the Court finds that Deputies Vanatta, Tomlin, and Torres shall each be liable to the Plaintiff for $5,000.00 in punitive damages, for a total punitive damages award of $15,000.00. Cf. Boesing, 540 F.3d at 888-90 (upholding jury award of $20,000.00 in punitive damages

-40-

where officer sprayed handcuffed arrestee with mace and also struck him with a baton); Estate of Davis v. Delo, 115 F.3d 1388, 1396-97 (8th Cir. 1997) (upholding punitive damages award of $5,000.00 against each defendant where trial court found evidence of malicious or evil intent in officer's beating of inmate while inmate offered no resistance and taunting and threatening of inmate the following day); Jackson, 873 F.2d at 1109 (upholding jury award of $50,000.00 in punitive damages where officer slammed handcuffed arrestee's face into pavement).

B. Denial of Proper Mental Health Treatment - First Incarceration

**Liability**

Plaintiff has alleged that he was denied medication for his mental disorders during the entirety of his first incarceration at the BCDC from July 7, 2007, through August 3, 2007. The Eighth Circuit analyzes both a pretrial detainee's and a convicted inmate's claim of inadequate medical care under the deliberate indifference standard. See Butler v. Fletcher, 465 F .3d 340, 344 (8th Cir. 2006), cert. denied, 550 U.S. 917 (2007). To prevail on such a claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs. See Estelle v. Gamble, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials

-41-

actually knew of but deliberately disregarded those needs.'" <u>Jolly</u> <u>v. Knudsen</u>, 205 F.3d 1094, 1096 (8th Cir. 2000)(quoting <u>Dulany v.</u> <u>Carnahan</u>, 132 F.3d 1234, 1239 (8th Cir. 1997)).  With due regard for jail medical staff and the difficult task that is theirs, but with equal regard for the duty that is this Court's by virtue of its office, the Court turns to the task of examining whether Defendants were deliberately indifferent to a serious mental health need of Plaintiff.

Plaintiff has been diagnosed as suffering from severe bipolar disorder with psychotic features, panic disorder, and schizophrenia.  Plaintiff has been prescribed various medications for these disorders, including Lamictal, Zyprexa, Desipramine, Abilify, Zoloft and Rozerem.  Plaintiff received inpatient treatment in January 2007, after attempting to commit suicide, and also received treatment in April 2007, for "frequent suicidal thoughts and actions."  Defs.' Ex. 8 at pg. 18.  This evidence clearly demonstrates that Plaintiff's mental health disorders constituted an objectively serious medical need.

With regard to whether Defendants were deliberately indifferent to his mental health needs, the Court first notes that it credits Plaintiff's testimony over that of Dr. Huskins.  As discussed above, the Court found Plaintiff to be a very credible witness. As detailed below, the Court found inconsistencies in Dr. Huskins' testimony, as well as deficiencies in his medical record

keeping, which caused the Court to seriously question his credibility.  The Court credits Plaintiff's testimony that when he saw Dr. Huskins on July 11, 2007, he was rushed through the process and he was not given an opportunity to explain what problems he was having to Dr. Huskins, as Dr. Huskins cut him off and stated that he could contact Dayspring about Plaintiff's medications.  Indeed, Dr. Huskins himself testified that he did not ask Plaintiff what problems he was experiencing or about his "psychiatric stuff," Trial Tr. at pg. 73, despite the fact that the medications Plaintiff indicated he had been taking signaled to Dr. Huskins that Plaintiff had a major mental health problem.

Dr. Huskins testified that Plaintiff's mood and affect seemed normal, but the Court does not believe that Dr. Huskins properly evaluated Plaintiff so as to make this determination.  As Plaintiff pointed out at trial and Dr. Huskins acknowledged, without giving Plaintiff an opportunity to explain his problems, Dr. Huskins would not know that Plaintiff "hears voices" or "sees things."  Trial Tr. at pg. 117.  The Court further questions the thoroughness of Dr. Huskins' evaluation and the accuracy of his medical notes, as he made no notation of the physical injuries Plaintiff sustained from the excessive force incident four days prior, nor did he ask Plaintiff how he sustained these injuries.  Even the deputy who booked Plaintiff in on July 7th reported that Plaintiff appeared to be in need of emergency medical services as he had scrapes,

bruising and knots all over his body and face. Defs.' Ex. 3. Dr. Huskins acknowledged, after viewing Plaintiff's booking photograph, that these injuries would have looked exactly the same when he saw Plaintiff on July 11th, that his notes should have referenced Plaintiff's injuries, and that he had no explanation for why they did not.

Dr. Huskins did contact Dayspring to retrieve Plaintiff's records and also contacted Plaintiff's pharmacy, but the information provided by the pharmacy did not match the information provided by Plaintiff. Dr. Huskins testified that he, therefore, decided to wait for the Dayspring records to confirm the correct prescription for Plaintiff. The Dayspring records were sent to the BCDC on July 16th. Dr. Huskins acknowledged that he did see these records at some point, as the cover sheet contains a handwritten notation by him stating that Plaintiff was last evaluated on April 20, 2007. Dr. Huskins, however, failed to document when the records were received, as he "usually" does. From the BCDC's nurse's response to Plaintiff's July 24th medical request, it appears that, for some unknown reason, the Dayspring records still had not been received by the BCDC at least as late as July 25th.

Dr. Huskins testified that had he seen Plaintiff's medical requests or his Dayspring records, he would have offered Plaintiff the medications he had been prescribed by Dayspring. The Court notes that Dr. Huskins' testimony regarding the medical requests

appeared to border on dishonesty.  The Court specifically asked Dr. Huskins if he received the medical requests and Dr. Huskins stated that he did not.  The Court then read to Dr. Huskins BCDC's written policy requiring that these requests be kept in an inmate's medical file.  Dr. Huskins then acknowledged that the requests are kept in the medical file, but explained that he does not look at them because the "[m]edical forms are all on the left and my notes are all on the right."  Trial Tr. at pg. 123.  Perhaps there is some innocent explanation for the inconsistency in Dr. Huskins' testimony regarding his access to the medical request forms and the Court will give him the benefit of the doubt in this instance. **However, Dr. Huskins is cautioned that the Court may not do so in the future and that dishonesty before the Court will have consequences.**

Dr. Huskins' own testimony establishes that he had access to Plaintiff's medical request forms, so, even absent receipt of the Dayspring records, he could have pulled Plaintiff's medical file and seen that Plaintiff was, in fact, experiencing problems without his medications:  Plaintiff complained of being bipolar and of having  paranoia and major depression and stated that he really needed his medications because he was having troubles.  As stated above, Dr. Huskins acknowledged that he would have started Plaintiff on medication had he seen these requests.

Further, with regard to the Dayspring records, Dr. Huskins testified that he did not have any sort of "tickler" system in place to follow up on the receipt of Plaintiff's medical records. Other courts have held that failure of a defendant to take reasonable steps that will aid in obtaining necessary medical information can be the basis of a deliberate indifference finding, and that the harm that flows from inadequate or absent medical records "is manifest." Coleman v. Wilson, 912 F. Supp. 1282, 1315 (E.D. Cal. 1995); see also Venus v. Goodman, 556 F. Supp. 514 (D.C. Wis. 1983) (holding the jury finding that failure of a defendant to obtain plaintiff's medical records was deliberate indifference to serious medical needs was supported by the evidence and not unreasonable.)  Jails and prisons must maintain adequate, complete, and accurate medical records. Ginest v. Board of County Comm'rs of Carbon County, 333 F. Supp.2d 1190, 1200 (D. Wyo. 2004) ("Jails and prisons must maintain adequate, complete, and accurate medical records. Maintaining proper medical records is no less important to inmate health than providing proper physician care. The two go hand in hand").  The Eighth Amendment is implicated when inadequate, inaccurate, and unprofessionally maintained medical records give rise to the possibility of a disaster stemming from a failure to properly chart medical care received. Cody v. Hilliard, 599 F. Supp. 1025, 1057(D. S.D. 1984) (citing Dawson v. Kendrick, 527 F. Supp. 1252, 1306-07 (S.D. W.Va. 1981)).  Moreover,

"[i]nadequate, inaccurate and unprofessionally maintained medical records" may violate the Eighth Amendment when they constitute a "grave risk of unnecessary pain and suffering." Burks v. Teasdale, 492 F. Supp. 650, 678 (W.D. Mo. 1980). These courts recognize that "[a]dequate and accurate medical records are critically important in any attempt to provide continuity of medical care." Id. at 676.

Dr. Huskins should have had a system in place for making certain that the Dayspring records were either obtained or, once they were not timely obtained, for otherwise following up on Plaintiff's need for mental health medication. The Court finds that Dr. Huskins acted with deliberate indifference in failing to properly evaluate the Plaintiff and discern the gravity of his mental health problems when he saw him on July 7th; failing to check Plaintiff's medical file for any complaints of problems while Dr. Huskins was waiting for the Dayspring records; failing to utilize any sort of system to ensure that the records were timely obtained; and, when the records were not timely obtained, failing to evaluate and prescribe Plaintiff appropriate medication or refer Plaintiff to a mental health professional to do so. The Court finds that Dr. Huskins should be held liable in his individual capacity.

There is no basis for holding any other Defendant liable in their individual capacity with regard to this particular claim, as there was no evidence presented at trial that any other Defendant was personally involved in the denial of mental health medications during Plaintiff's first period of incarceration. The Court notes

that Defendant's Exhibit 7 did contain one grievance filed by Plaintiff in which he mentioned that he had several anxiety attacks and Deputy Pop did "nothing" for him.  Defs.' Ex. 7 at pg. 10. This is insufficient to hold Deputy Pop liable, as there is no evidence that Deputy Pop knew of the extent of Plaintiff's mental health problems or that he was being denied his mental health medications.

There is likewise no basis for holding any Defendant liable in their official capacity with regard to this particular claim, as there was no evidence that any unconstitutional policy or custom or failure to train contributed to Plaintiff being denied his mental health medications.  See Brockinton, 503 F.3d at 675.

### Damages

As set out above, Plaintiff complained about needing his medications and about "having troubles," Defs.' Ex. 7 at pg. 3; about being bipolar and suffering from paranoia and major depression; and about having two breakdowns in the jail and having a hard time being around people.  The Court credits Plaintiff's testimony that his mental problems cause him to hear and see things, and that, without his medication, he had difficulty being around other inmates; he became distraught, anxious and depressed; he had crying spells; and he had suicidal thoughts, which he eventually acted on by attempting to hang himself.

The Prison Litigation Reform Act (PLRA) limits inmates' recovery "for mental or emotional injury suffered while in custody

-48-

without a prior showing of physical injury." 42 U.S.C. § 1997e(e). The Court finds that Dr. Huskins' deliberate indifference to Plaintiff's need for mental health medication resulted in Plaintiff attempting to hang himself.  This attempt resulted in Plaintiff choking to the point of passing out, which surely constitutes a physical injury.  See Arauz v. Bell, 2009 WL 152148, *5 (6th Cir. 2009) (inmate's allegation that he attempted suicide satisfied § 1997e(e)'s physical injury requirement; attempting suicide, by definition, involves hurting oneself and court could presume the existence of some physical injury resulting from attempt).  The Court, therefore, finds that Plaintiff is entitled to recover for both the physical pain and emotional suffering he endured from being denied his medications.  See 8th Cir. Civil Jury Instr. § 4.50A (2011).

The Court finds that an award of $11,500.00 is sufficient to compensate Plaintiff for the emotional pain and suffering he endured from being denied his medications.  This award represents $500.00 a day from July 11, 2007, the date Dr. Huskins saw Plaintiff and could have started him on some form of medication, through August 3, 2007, the date Plaintiff was released from the BCDC.  The Court notes this award is also justified by the fact that, after being off his medications for this length of time, Plaintiff had to restart them at beginning dosage levels, further delaying their effectiveness and resulting in additional emotional pain and suffering even after his release from the BCDC.  With

-49-

regard to the physical pain and suffering Plaintiff endured from his suicide attempt, the Court finds an award of $2,000.00 to be appropriate.  The Court does not find that Dr. Huskins' conduct was motivated by evil motive or intent or that it rose to the level of reckless or callous indifference.  The Court, therefore, finds that an award of punitive damages is not warranted.

### C. Denial of Mental Health Care - Second Incarceration

**Liability of Deputy Rutledge and Damages Warranted**

The Court credits Plaintiff's testimony that when he booked into the BCDC on November 6, 2007, he handed an envelope containing his transfer record from the LCDC to Deputies Finnegan and Reyes; told the deputies that it contained a list of the medications he had been taking at the LCDC; and when they asked Deputy Rutledge what to do with it, she instructed them, "Put it in his property, inmates at the Benton County Jail don't have mental health problems, they're just a bunch of manipulators."  Jail guards act with deliberate indifference to an inmate's serious medical needs if they "intentionally deny[] or delay[] access to medical care or intentionally interfer[e] with the treatment once prescribed." Orr v. Larkins, 610 F.3d 1032, 1034-35 (8th Cir. 2010).  This is exactly what Deputy Rutledge did in this instance and the Court, therefore, finds that Deputy Rutledge's actions constituted deliberate indifference.

With regard to the issue of damages, Plaintiff certainly suffered emotional pain and suffering as a result of Deputy

Rutledge's actions.  Plaintiff's transfer record indicated that he
was a "high suicide risk" and had been prescribed three very
powerful mental health medications.   As a result of Deputy
Rutledge's actions, Plaintiff stopped receiving these medications
cold turkey, which certainly posed a serious risk to his mental
health and safety.   The Court notes in this regard Plaintiff's
suicide attempt at the BCDC in June 2007 when he was off his
medications, as well as his Vista Health records documenting
extreme suicidal ideation in January 2007 when Plaintiff was off of
his medications.   Nonetheless, there is no evidence that Plaintiff
suffered a physical injury during his second period of
incarceration at the BCDC, and thus, the PLRA prohibits any
recovery for his emotional pain and suffering.

Nominal and punitive damages, however, may still be awarded.
See Royal, 375 F.3d at 723.  The Court finds that the Plaintiff is
entitled to recover $1.00 in nominal damages from Deputy Rutledge.
The Court further finds that punitive damages should be assessed
against Deputy Rutledge.   Deputy Rutledge's instruction to place
Plaintiff's transfer record in his property and Deputy Rutledge's
statement that inmates are manipulators and do not have mental
health needs clearly evidenced reckless or callous indifference to
Plaintiff's mental health needs.   This is especially true given
that, during the booking process, Deputy Rutledge became aware that
Plaintiff was taking three mental health medications; had attempted
suicide and received inpatient psychological treatment just five

-51-

months prior; and had been in and out of treatment at several
different places.  The Court finds that an award of $15,000.00 is
warranted to punish Deputy Rutledge's willful and malicious conduct
and to deter her from engaging in such conduct in the future.  The
Court finds that this award is also warranted to deter other
deputies from such conduct, as it appears Deputy Rutledge's view of
inmate's mental health needs may be shared by other deputies at the
BCDC, given that Deputies Finnegan and Reyes were complicit in
placing the transfer record in Plaintiff's property.

### Liability of Dr. Huskins and Damages Warranted

The Court credits Plaintiff's testimony that when he saw Dr.
Huskins on December 27, 2007, he tried to explain the medications
he had been taking at the LCDC and that there was a transfer record
documenting the prescriptions in his property, but Dr. Huskins
ignored him, rushed him through, and merely prescribed him a low
dose of Mellaril, which "did absolutely nothing" for the Plaintiff.
Plaintiff, thereafter, repeatedly complained that the Mellaril was
not working and was not for his "problems"; he quit taking the
medication at one point because of this fact; he asked to be placed
in segregation, even in "the hole" because he was getting worse,
felt unsafe, his voices were "getting really bad," and he was
having more anxiety attacks and paranoia.  Plaintiff also asked to
be seen by someone at Ozark Guidance.

The Court also credits Plaintiff's testimony that, in his
subsequent visits with Dr. Huskins, Dr. Huskins always "rushed him

through," never asked him how he was doing on the Mellaril, and never offered him any counseling. The Court notes that, given Plaintiff's continued complaints in his medical requests, the Court finds it difficult to believe Dr. Huskins' testimony that, for the most part, Plaintiff's affect was good and he had improved on the Mellaril. The Court questioned Dr. Huskins as to why Plaintiff would want to see him again and again if the Mellaril was, in fact, working. Dr. Huskins appeared to try to evade answering the question, simply stating, "He wanted to talk about his medication." Trial Tr. at pgs. 124-26. When the Court pushed the issue and asked Dr. Huskins what Plaintiff said about his medication, Dr. Huskins then acknowledged that he did not know, that Plaintiff could have said that the Mellaril was not working, but "I put down his affect was good which would suggest that to me he was saying he was doing okay on the medication." Id. As pointed out above, the evidence in this case demonstrates that Dr. Huskins' notes are not always accurate or complete.

The Court finds that Dr. Huskins was deliberately indifferent to Plaintiff's mental health care needs by not retrieving Plaintiff's transfer record from his property, as Plaintiff requested. This record would have revealed the severity of Plaintiff's mental health disorders, that he was a high suicide risk, and the appropriate medications to effectively treat his problems. Dr. Huskins acknowledged, with regard to Plaintiff's first period of incarceration, that had he seen Plaintiff's

Dayspring records, he would have offered Plaintiff the Lamictal and Zyprexa he had been prescribed there.  While Dr. Huskins testified that he would have recommended Mellaril instead of Zyprexa, he acknowledged that something like Lamictal – a seizure medication used to treat bipolar disorders, which Plaintiff had been taking at the LCDC in addition to Zoloft and Zyprexa – might be necessary as well.  Dr. Huskins received Plaintiff's Dayspring records again during Plaintiff's second period of incarceration, yet, contrary to his testimony with regard to Plaintiff's first period of incarceration, he did not offer Plaintiff the medications he had been prescribed at Dayspring, nor did he start offering Plaintiff Lamictal when the Mellaril alone was not working.

Dr. Huskins acknowledged that he did not know that Plaintiff was hearing voices or having more anxiety attacks.  Had Dr. Huskins reviewed Plaintiff's medical requests or properly evaluated the Plaintiff during his visits with him, Dr. Huskins would have known this.  The Court finds that Dr. Huskins was deliberately indifferent in failing to review Plaintiff's medical requests, which would have revealed that the Mellaril was not working and that Plaintiff continued to experience severe psychological problems.  Dr. Huskins was further deliberately indifferent in failing to properly evaluate Plaintiff during his visits with him: Dr. Huskins rushed Plaintiff through and did not discuss with Plaintiff the problems he was having, how the Mellaril was actually

working for him, or why Plaintiff quit taking the Mellaril at one point.

With regard to the issue of damages, as pointed out above, Plaintiff is entitled to a nominal damage award of $1.00 against Dr. Huskins, but compensatory damages cannot be awarded, as Plaintiff did not suffer a physical injury.  With regard to punitive damages, the Court does not find that Dr. Huskins acted with reckless or callous indifference to Plaintiff's mental health needs, as he did prescribe Plaintiff some form of mental health medication and did increase it on two occasions.  The Court notes that, according to the Physician's Desk Reference and the National Library of Medicine, Mellaril is generally only used to treat symptoms of schizophrenia "in people who have already been treated with at least 2 other medications and have not been helped or who have experienced severe side effects."  U.S. Nat'l Library of Medicine, Nat'l Insts. of Health (March 23, 2011), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000584/; Physician's Desk Reference, 65th Ed., pgs. 2442-43 (2011).  The Court, therefore, questions why Dr. Huskins would have prescribed this medication to the Plaintiff.  However, the Court cannot say that in doing so, Dr. Huskins acted with reckless or callous disregard to Plaintiff's mental health needs.  Accordingly, the Court declines to award punitive damages against Dr. Huskins.

**Liability of Sheriff Ferguson and Captain Petray**

**for Failure to Train and Damages Warranted**

Sheriff Ferguson and Captain Petray are responsible for the adoption and implementation of the BCDC's policies in connection with all aspects of the housing and care of inmates. See Pfeifer v. Ferguson, Case No. 08-5073 (W.D. Ark. Dec. 15, 2010), Doc. 81 at pg. 28 (noting that Sheriff Ferguson and Captain Petray conceded this fact). Petray acknowledged that he was responsible for "oversee[ing] that the polices and procedures were adhered to" by deputies. Sheriff Ferguson likewise shares in this responsibility. See Ark. Code Ann. § 12-41-502 (Supervision by sheriff: The sheriff of each county shall have the custody, rule, and charge of the jail within his county and all prisoners committed in his county, and he may appoint a jailer for whose conduct he shall be responsible).

A supervisor, such as Sheriff Ferguson or Captain Petray, may be held liable in his individual capacity for the failure to train an inferior officer if the supervisor was deliberately indifferent to the need to train and the lack of training actually caused the alleged constitutional violation. See Connick v. Thompson, No. 09-571, slip op. at 6-7 (S. Ct. Mar. 29, 2011) (addressing failure-to-train claim against district attorney in his official capacity); Parrish v. Ball, 594 F.3d 993, 1002 (8th Cir. 2010) (applying same standard to failure-to-train claim against supervisor in his individual capacity). "A pattern of similar constitutional

violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." <u>Connick</u>, slip op. at 9-10 (quoting <u>Board of Comm'rs of Bryan Cty. v. Brown</u>, 520 U.S. 397, 409 (1997)). However, evidence of a single violation of an individual's rights can trigger liability if the violation was a "'highly predictable consequence'" of the failure to train. <u>Connick</u>, slip op. at 11 (quoting <u>Bryan Cty.</u>, 520 U.S. at 409).

As noted above, Defendants did not submit the BCDC's written policy on booking and intake procedures as an exhibit. The Court asked for and obtained this policy, and it clearly states that intake deputies are to be "particularly aware of mental health questions," and if even one question on the intake forms is answered "Yes," the deputies are to notify medical staff as soon as possible. Defs.' Ex. 20 at pg. 10.4 ¶ III.M.6.a. While this policy is well written and appears to solidly manage the mental health needs of inmates booking into the BCDC, the testimony in this case indicates that there is a total non-compliance with said policy as a result of a woeful lack of training regarding this policy.

Captain Petray himself did not even know if there was a specific intake form asking about inmates' past mental problems, when, in fact, there is a Suicide Risk form asking just that. Further, Captain Petray believed that the BCDC policy called for

intake forms to be forwarded to medical staff only if an inmate answered "Yes," to several questions, when, in fact, the written policy requires that the forms be forwarded if there is even one affirmative answer to a mental health question.

Deputy Rutledge testified that she was not trained on the booking/intake policy.  When asked what training she received in order to know when to forward the Suicide Risk form to the medical staff, Deputy Rutledge explained that she was "just shown how to do the procedures, ask the questions," and "wasn't trained to forward it to medical."  Deputy Rutledge testified that even if an inmate indicated that he had attempted suicide in recent months, she would not forward the form to medical, and would only take action if the inmate indicated that he was currently contemplating suicide, in which case, she would notify her sergeant.

When the Court read the booking/intake policy to Deputy Rutledge, she acknowledged that, pursuant to that policy, Plaintiff's Suicide Risk form should have been forwarded to medical, as he answered "Yes" to one or more questions on the form, indicating in his responses that he was taking three medications for his mental disorders; that he had attempted suicide five months prior; and that he had been admitted to a mental health facility following his suicide attempt.  Deputy Rutledge testified that deputies do not follow the written booking/intake policy and that she had no "answer" for why they did not.

Similarly, Deputy Finnegan testified that he did not know if there was a policy in place detailing when intake forms should be forwarded to the medical staff.  According to Deputy Finnegan, it was a "common sense judgment call" to forward the forms if the inmate had a serious medical need, such as heart problems, etc.

The Court finds that the above testimony demonstrates a lack of training on BCDC's booking/intake policy which constitutes deliberate indifference to the mental health needs of inmates booking into the BCDC.  Had the BCDC's policy been followed during Plaintiff's second period of incarceration, Plaintiff's intake forms would have been forwarded to the BCDC medical staff to evaluate his need for mental health medication. The Court, therefore, finds that the lack of training caused Plaintiff to be deprived of his mental health medications.  To the extent that the Defendants might argue that there was no pattern of similar constitutional violations by untrained deputies, the Court notes that this is not the first instance in which it has found a complete lack of training for deputies on BCDC's written policies regarding the taking of inmates' medical histories and when to forward medical questionnaires to the medical staff.  See Pfeifer, Case No. 08-5073, Doc. 81 at pgs. 31-32, 36.  Further, the Court finds that the violation of Plaintiff's rights in this case gives rise to the single-violation theory of liability discussed in Connick, as the violation was a "'highly predictable consequence'" of the failure to train deputies on BCDC's written booking/intake

-59-

policy regarding when to alert medical staff of an inmate's mental health needs.  Cf. Woodward v. Correctional Med. Servs. of Ill., Inc., 368 F.3d 917, 929 (7th Cir. 2004) (fact that no previous suicides had occurred in county jail showed that medical services provider "was fortunate, not that it wasn't deliberately indifferent"; defendant did not get a "one free suicide pass" where its deliberate indifference was demonstrated by condoning of its employees not following policies).

Accordingly, the Court finds Sheriff Ferguson and Captain Petray liable in their individual capacities on this claim.  As the same standard of liability applies to Plaintiff's claim against these Defendants in their official capacities, the Court finds them liable in their official capacities as well.  See Andrews v. Fowler, 98 F.3d 1069, 1078 (8th Cir. 1996) (applying the same standard from official capacity failure to train to the individual capacity allegation).

With regard to the issue of damages, again, as Plaintiff suffered no physical injury during his second period of incarceration, he may only recover nominal, and, if warranted, punitive damages.  The Court hereby awards Plaintiff nominal damages in the amount of $2.00 against Sheriff Ferguson and Captain Petray.

With regard to punitive damages, as noted above, this is not the first instance in which the Court has found a lack of training for deputies on the taking of inmates' medical histories and the

forwarding of medical questionnaires to the medical staff.  The
Court finds that the lack of training regarding the policy at issue
in this case evidences reckless and callous disregard to inmates'
mental health needs.  Plaintiff's answers to the questions on the
intake forms should have alerted any deputy that he had serious
mental health needs and needed to be evaluated by medical staff.

Sheriff Ferguson and Captain Petray cannot escape liability
for punitive damages by relying on the fact that Plaintiff could
have submitted a medical request to alert medical staff to his
mental health needs.  The Court credits Plaintiff's testimony that
he did just that during the first month or so of his second
incarceration, but, apparently the medical requests were not
forwarded to the medical staff, as Plaintiff did not see Dr.
Huskins until nearly a month and a half after he booked into the
BCDC.  Thus, the medical request system cannot be relied upon to
guarantee that a mentally ill inmate will be timely evaluated.

Further, on one occasion, Plaintiff had to wait ten days after
submitting his medical request before seeing Dr. Huskins.  To
expect a severely mentally ill inmate classified as a high suicide
risk, who books into the BCDC without his medications in hand, to
submit a medical request form and go without his medications for
possibly several days until he can see the jail doctor is a
reckless and callous disregard for the inmate's mental health
needs.  The BCDC's written policy recognizes this fact in its
requirement that medical staff be notified as soon as possible if

-61-

an inmate answers "Yes" to even one question about his mental health.  The Court, therefore, concludes that Sheriff Ferguson and Captain Petray acted with reckless and callous disregard for Plaintiff's mental health needs in failing to train BCDC deputies on this policy.  Cf. Woodward, 368 F.3d at 930-31 (upholding punitive damage award of $1.5 million to estate of pretrial detainee who committed suicide, where there was evidence of a culture that permitted and condoned violations of policies designed to protect mentally ill inmates).  The Court hereby awards Plaintiff $5,000.00 in punitive damages against Sheriff Ferguson in his individual capacity and $5,000.00 in punitive damages against Captain Petray in his individual capacity.  **Sheriff Ferguson is cautioned that, if circumstances warrant in the future, the Court may require that he prepare and submit to the Court a Remedial Plan for addressing the lack of training for deputies on the BCDC's policies and procedures.**

### III.  CONCLUSION

Based on the foregoing, the Court will enter a separate judgment dismissing Plaintiff's claims against Deputy Pop, but entering judgment in favor of Plaintiff and against the remaining Defendants in the amount of $59,004.00, which represents:

* $500.00 in compensatory damages assessed against Deputy Vanatta for the use of the OC spray upon his first entry into Plaintiff's cell on July 7, 2007;

-62-

* $5,000.00 in compensatory damages assessed against Deputies Vanatta, Tomlin and Torres, jointly and severally, for the excessive force used against the Plaintiff upon the second entry into Plaintiff's cell on July 7, 2007;

* $5,000.00 in punitive damages assessed against Deputy Vanatta, $5,000.00 in punitive damages assessed against Deputy Tomlin, and $5,000.00 in punitive damages assessed against Deputy Torres, for a total of $15,000.00 in punitive damages for the excessive force used upon the second entry into Plaintiff's cell on July 7, 2007;

* $13,500.00 in compensatory damages assessed against Dr. Huskins for deliberate indifference to Plaintiff's mental health needs during Plaintiff's first period of incarceration, and $1.00 in nominal damages for the same deliberate indifference during Plaintiff's second period of incarceration;

* $1.00 in nominal damages and $15,000.00 in punitive damages assessed against Deputy Rutledge for deliberate indifference to Plaintiff's mental health needs during his second period of incarceration; and

* $2.00 in nominal damages assessed against Sheriff Ferguson and Captain Petray, $5,000.00 in punitive damages assessed against Sheriff Ferguson, and $5,000.00 in punitive damages assessed against Captain Petray for

their deliberate indifference in failing to properly train deputies on booking/intake policies and procedures for inmates with mental health needs.

Further, the Court will require the Defendants to pay the court filing fee of $350.00 that has been assessed against the Plaintiff.  If all or any portion of the filing fee has been paid through deductions from Plaintiff's inmate account, the Clerk is instructed to refund the funds to Plaintiff.

Finally, the Court notes that in their answer, under the caption "Affirmative Defenses," Defendants asserted that "[a]ny amount sought by the Plaintiff" should be offset by the costs of his incarceration at the BCDC pursuant to Ark. Code Ann. § 12-41-505.  (Doc. 9 at pg. 2 ¶ 4.I.)  Defendants did not present any evidence at trial regarding the costs of Plaintiff's incarceration and, in any event, it is does not appear that Plaintiff's damage award should be offset by such costs.  See Beeks v. Hundley, 34 F.3d 658, 661 (8th Cir. 1994) (an important purpose of § 1983 is to serve as a deterrent against future constitutional deprivations; the goal of deterrence would be intolerably undermined if the State could recover costs of incarceration from "'the very monies'" it paid on account of the unlawful conduct of prison officials) (quoting Hankins v. Finnel, 964 F.2d 853, 861 (8th Cir.), cert. denied, 506 U.S. 1013 (1992)).  Accordingly, Defendants' request for an offset is hereby **DENIED**.

-64-

**IT IS SO ORDERED this 29th day of March 2011.**


/s/ Erin L.  Setser
   HON.  ERIN L.  SETSER
   U.S.  MAGISTRATE JUDGE